| | |
|---|---|
| **Integrity Environmental Solutions, LLC, and JJAM Stand, LLC,**<br><br>**Plaintiffs,**<br><br>**vs.**<br><br>**Matthew Outlaw and LFG Service Partners, Inc.,**<br><br>**Defendants.** | **Defendant Matthew Outlaw's Affirmative Defenses and Answer to Amended Complaint** |

Defendant Matthew Outlaw responds to the allegations of Plaintiffs' Amended Complaint as follows:

## Affirmative Defenses

### First Affirmative Defense
Incorporation of Defenses Set Forth Elsewhere Herein

To the extent to which any and all matters of affirmative defenses and/or defenses otherwise are set forth in the preceding answers above, the same are incorporated herein by reference as though fully set forth at length herein.

### Second Affirmative Defense
Failure to State a Claim

Plaintiffs fail, in whole or in part, to state a claim against Defendant Outlaw upon which relief can be granted.

### Third Affirmative Defense
Failure to Mitigate Damages

Plaintiffs are barred from any recovery from or relief against Defendant Outlaw to the extent that some or all of the losses or damages alleged in Plaintiffs' Amended Complaint or otherwise claimed could have been avoided or minimized by Plaintiffs, and Plaintiffs are barred from any such recovery from Defendant Outlaw because Plaintiffs have failed to mitigate their damages (all such damages being again denied).

### Fourth Affirmative Defense
Invalid contract

Defendant Outlaw denies any breach of contract but asserts as an affirmative defense to Plaintiffs' claims of breach of contract that the contracts alleged were invalid and unenforceable.

### Fifth Affirmative Defense
Unclean Hands

Defendant Outlaw believes, and therefore alleges, that all or some of the claims and causes of action set forth by Plaintiffs are barred due to the equitable doctrine or unclean hands, by reason of Plaintiffs' actions, conduct, representations, and/or failure to act, or those of Plaintiffs' agents, employees or those in privity.

## Sixth Affirmative Defense
Laches

Defendant Outlaw denies all liability, but should it be determined that Defendant Outlaw is liable in whole or in part to Plaintiffs, Plaintiffs should be barred from recovering damages to the extent that such recovery would violate the equitable doctrine of laches.

## Seventh Affirmative Defense
Absence of Damages

Defendant Outlaw asserts as an affirmative defense that even if Plaintiffs' allegations are true, Plaintiffs did not suffer any actual damages, loss, or interference with operations.

## Eighth Affirmative Defense
No Proximate Cause

To the extent that Plaintiffs have suffered any damages, Defendant Outlaw's conduct was not the legal or proximate cause of those damages.

## Ninth Affirmative Defense
Failure to Please Trade Secrets with Specificity

Defendant Outlaw asserts as an affirmative defense that Plaintiffs have failed to plead trade secrets with sufficient specificity to meet the statutory requirements.

**<u>Tenth Affirmative Defense</u>**
Information was Not a Trade Secret

The information alleged to have been misappropriated does not qualify as a trade secret under the relevant statute.

**<u>Eleventh Affirmative Defense</u>**
No Misappropriation/Plaintiffs' Consent/Authorized Access

Defendant Outlaw did not misappropriate any trade secrets as defined by statute because any access he had to alleged trade secrets and any actions he took in regard to alleged trade secrets was at the consent of Plaintiffs and therefore could not constitute misappropriation of trade secrets or theft by employee. Similarly, Defendant Outlaw cannot be liable for computer fraud or abuse because Defendant Outlaw's access was authorized by Plaintiffs and Defendant Outlaw's actions were within the scope of his authorization.

**<u>Twelfth Affirmative Defense</u>**
Lack of Intent

Defendant Outlaw had no unlawful intent and no intent to deprive Plaintiffs of any information or property, therefore any claims of Plaintiffs that require unlawful intent must fail.

**<u>Thirteenth Affirmative Defense</u>**
No Fiduciary Relationship

As a non-Manager Member of Plaintiff Integrity, Defendant Outlaw owed no fiduciary duty to either Plaintiff.

## Fourteenth Affirmative Defense
### No Property Taken

Defendant Outlaw asserts that no goods or chattels were taken and therefore N.C.G.S. § 1-538.2 does not apply.

## Reservation of Defenses

Defendant Outlaw hereby gives notice of his intent to rely upon such other and further affirmative and/or special or separate defenses as may become apparent through discovery proceedings, further investigation, or otherwise in this matter and hereby reserves the right to amend his pleadings to reflect any such defenses or new matters. Furthermore, Defendant Outlaw reserves the right to re-evaluate, restate, or delete any defenses and/or to assert any additional defenses. By listing any matter as an affirmative defense, Defendant does not assume the burden of proving any matter upon which Plaintiffs bear the burden of proof under applicable law.

## General Denial Except Where Specifically Admitted

Except as specifically admitted in Defendant Outlaw's Answer, Defendant Outlaw denies all Plaintiffs' allegations.

## Nature of the Action

*Integrity et al v. Outlaw et al*
Defendant Outlaw's Affirmative Defenses and Answer to Amended Complaint

1.     Plaintiffs bring this action against Outlaw, a former employee of JJAM and Member of Integrity and their former Director of Operations, Maintenance and Monitoring, and his new employer, LFGSP, seeking injunctive relief and compensatory damages.   Outlaw maliciously and surreptitiously misappropriated Plaintiffs' highly confidential business information and trade secrets in furtherance of a conspiracy with LFGSP, a direct competitor, to irreparably damage Plaintiffs' business and to enable Outlaw and LFGSP to use this information to gain an unfair competitive advantage over Plaintiffs.   Outlaw was bound by two sets of restrictive covenants contained in a JJAM 2020 Confidentiality and Noncompetition Agreement (the "**Noncompete Agreement**") and the 2024 Integrity Environmental Solutions, LLC Operating Agreement (the "**Operating Agreement**") which prohibited him from competing against Plaintiffs, soliciting their customers and employees, and using or disclosing their  confidential information both during and following cessation of his employment (by JJAM) and membership (in Integrity) for 1 year.   Outlaw used his position with Plaintiffs to gain access to and misappropriate Plaintiffs' confidential information and trade secrets and is now using the same to compete against Plaintiffs as an employee of LFGSP.   Outlaw's disloyal and malicious actions must be enjoined immediately before further damage can be done to Integrity.    Based on Defendant's actions, Plaintiffs allege causes of action against the Defendants for Breach of Contract; Misappropriation of Trade Secrets in Violation of the Trade Secrets Protection Act (N.C. Gen. Stat. § 66-152 *et seq.*); Computer Trespass (N.C. Gen. Stat. §14-458); Civil Liability for Theft by Employee (N.C. Gen. Stat. § 1-538.2); Violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(2)(C) and 18 U.S.C. § 1030(a)(5)(C); Violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836(b)(1); Breach of Fiduciary Duty; Tortious Interference with Contract;

Tortious Interference with Customer Relations and Prospective Customer Relations and Economic

Advantage; Civil Conspiracy; and Unfair and Deceptive Trade Practices (N. C. Gen. Stat. § 75-

1.1 *et seq.*).

**Denied.[1]**

## <u>Parties, Jurisdiction, and Venue</u>

2.      Integrity is a North Carolina limited liability company with its principal place of

business in Monroe, Union County, North Carolina.

**Admitted on information and belief.**

3.      JJAM is a North Carolina limited liability company with its principal place of

business in Monroe, Union County, North Carolina.

**Admitted on information and belief.**

---

[1] Defendant objects generally to the formatting of Plaintiffs' Amended Complaint, which fails to comply with Federal Rule of Civil Procedure 10(b), which requires that each paragraph of a pleading be "…limited as far as practicable to a single set of circumstances." Many paragraphs of Plaintiffs' Amended Complaint improperly combine multiple allegations, thereby complicating Defendant's ability to respond as required by Rule 8(b). Accordingly, to the extent any paragraph of this Answer does not expressly address every allegation contained within a multi-allegation paragraph of the Amended Complaint, any such unaddressed allegations are denied.

4.    Outlaw is, upon information and belief, a citizen and resident of Hillsborough County, Florida, and is a former Member and Director of Operating, Maintenance and Monitoring of Integrity.

- **Defendant Outlaw admits that he is a citizen and resident of Hillsborough County, Florida.**

- **Defendant Outlaw admits that he was formerly one of several Members and one of several Directors of Operating, Maintenance, and Monitoring of Integrity in Florida.**

- **Except as expressly admitted herein, all other allegations in Paragraph 4 are hereby denied.**


5.    LFGSP is an Ohio corporation headquartered in Wadsworth, Ohio that is a direct competitor of Plaintiffs.  LFGSP maintains a place of business in Florida which, upon information and belief, is operated and managed by Outlaw.

- **Defendant Outlaw admits on information and belief that LFGSP is an Ohio corporation headquartered in Wadsworth, Ohio.**

- **Defendant Outlaw denies that LFGSP is a direct competitor of Plaintiffs.**

- **Defendant Outlaw denies that LFGSP maintains a place of business in Florida.  Except as expressly admitted herein, all other allegations in Paragraph 5 are denied.**

6.     This Court has personal jurisdiction over the parties and subject matter jurisdiction over the action pursuant to 28 U.S.C. § 1331, by virtue of the fact that the Plaintiffs have asserted claims against the Defendants pursuant to two federal statutes, the Computer Fraud and Abuse Act 18 U.S.C. § 1030(a)(2)(C) and 18 U.S.C. § 1030(a)(5)(C) and the Defend Trade Secrets Act 18 U.S.C. § 1836(b)(1). The Defendants are subject to the personal jurisdiction of the Court pursuant to North Carolina's long arm statute, N.C. Gen. Stat. § 1-75.4.

**Defendant Outlaw admits that this Court has personal jurisdiction over him and subject matter jurisdiction in this matter. Except as expressly admitted herein, all other allegations in Paragraph 6 are hereby denied.**

7.     Venue is proper in this Court as Plaintiffs' principal office is located within the Western District of North Carolina.

**Admitted.**

## Plaintiffs' Business

8.     Integrity was formed in June, 2024, following a reorganization and rebranding of its wholly-owned subsidiary company, Carlson Environmental Consultants, PC ("CEC") which has been in business since 2004.   In December 2024, CEC was reorganized and renamed as JJAM STAND, LLC[2].  Through its conversion to an LLC and renaming JJAM retained CEC's rights in,

---

[2] Due to the subsequent name change, CEC will be hereafter referred to as JJAM.

*inter alia*, its noncompete agreements with its employees, including Outlaw, as well as its Confidential Information and trade secrets and employment policies.

**Defendant Outlaw lacks sufficient knowledge or information to form a belief as to the truth or falsity of the allegations contained in Paragraph 8, and thus denies the same.**

9.     Since 2004, Plaintiffs have offered comprehensive services for the landfill gas, solid waste, and environmental industries.    These services include Engineering/Design, Construction, Operations, Maintenance and Monitoring ("**O&M**"), Environmental Cleaning, and Environmental Services, all of which are designed to help customers comply with regulatory and permit requirements and to optimize the performance and life of their facilities and equipment; O&M includes both routine and non-routine/on-call maintenance for hundreds of public and private sites across the eastern United States and involves monitoring, tuning, and maintaining landfill gas wellfields; performing surface emission and perimeter gas probe monitoring; collecting landfill gas, air,  and liquids samples; inspecting and maintaining blowers, flares, control panels, and gas treatment systems; and installing, servicing, and replacing pumps and other leachate collection and gas appurtenances; Engineering/Design including landfill development planning, landfill gas collection and control system design and permitting, and construction quality assurance; Construction including cell development, cell closure, liner installation, flare and gas system construction, and leachate management system construction; Environmental Cleaning including "**Jet-Vac**" (an environmental cleaning process that uses high-pressure water and suction to clean debris from drains, sewers, and other pipes), cleaning applications, including pipelines,

sewers, manholes, forcemains, tanks, ponds, etc.; Environmental Services including permitting, compliance, monitoring and analysis, and remediation; and Special Projects within the environmental sector including landfill remediation, odor control, and emergency response.

**Defendant Outlaw lacks sufficient knowledge or information to form a belief as to the truth or falsity of the allegations contained in Paragraph 9, and thus denies the same.**

10. Plaintiffs' primary officers (with respect to JJAM) and Members (with respect to Integrity) include Jim Christiansen, Seth Nunes, P.E., Vince Coleman and Taylor Maxwell, P.E.

**Defendant Outlaw lacks sufficient knowledge or information to form a belief as to the truth or falsity of the allegations contained in Paragraph 10, and thus denies the same.**

11. Plaintiffs have offices in Monroe, Statesville and Hickory, North Carolina; Columbia, South Carolina; Richmond, Virginia; Olympia, Washington; Marietta, Georgia; Tampa and Orlando, Florida; Byesville, Ohio; and Tullytown, Pennsylvania. From these office locations, Integrity performs its services across the entire continental United States, with the exception of Montana, Idaho, Wyoming, Utah and Arizona.

**Defendant Outlaw lacks sufficient knowledge or information to form a belief as to the truth or falsity of the allegations contained in Paragraph 11, and thus denies the same.**

12.     Plaintiffs'  most important clients for which it has provided landfill gas ("**LFG**"),

O&M, and Jet-Vac services are: (a) Two national providers of landfill disposal services that

own/operate landfills across the United States to whom Plaintiffs have provided O&M and all

other services for over 20  years (hereinafter "**Major Client A**" and "**Major Client B**"); and (b)

A large electric and natural gas utility operating in North Carolina, South Carolina, Tennessee,

Ohio, Indiana, Kentucky and Florida to whom  Plaintiffs have provided Jet-Vac services for

several years starting in 2021 (hereinafter "**Major Client C**"). Due to their long association with

these clients, Plaintiffs are extremely familiar with their contracting, requirements, construction

requirements, safety requirements, their project operations and personnel, and other expectations

on these projects.

**Defendant Outlaw lacks sufficient knowledge or information to form a belief as to the**

**truth or falsity of the allegations contained in Paragraph 12, and thus denies the same.**


**Plaintiffs' "Confidential Information" and "Trade Secrets"**

13.     Plaintiffs expend significant time and resources developing their proprietary

business information, establishing effective and unique ways to deliver their  services, creating

beneficial relationships with its customers, prospective customers and suppliers, and in marketing

and advertising their services.

**Defendant Outlaw lacks sufficient knowledge or information to form a belief as to the**

**truth or falsity of the allegations contained in Paragraph 13, and thus denies the same.**

14.     The nature of Plaintiffs' business involves the use of confidential and trade secret information not generally known to the public or their competitors. Plaintiffs exercise reasonable efforts to maintain the confidentiality of this information.  Those efforts include, but are not limited to, restricting access to their confidential information to select employees with a need to know such information in order to perform their employment duties, segregating the confidential information into two separate areas of the computer network based on the sensitivity of the information and limiting access to the same to specific categories of employees based upon their level of corporate authority, assigning and requiring the use of computer passwords to access the drives and information, and notifying employees that this sensitive business information is confidential.

**Defendant Outlaw lacks sufficient knowledge or information to form a belief as to the truth or falsity of the allegations contained in Paragraph 14, and thus denies the same.**

15.     During the 21 years Plaintiffs have been in business, Plaintiffs have developed a number of methods of conducting their business and have compiled considerable customer information which they consider highly confidential and which gives them a competitive advantage in the marketplace. Plaintiffs specifically consider, and so inform their employees, that their customer lists, customer contact information, information regarding sales leads and prospective customers, customer requirements, customer preferences and purchasing history, customer proposals and bids, invoices, supplier and vendor cost information, profit margin, pricing, customer contracts, sales information, marketing strategies,  future Company expansion

plans, and other sensitive Company information not generally known to the public (hereinafter "**Confidential Information**") are confidential and proprietary.

**Defendant Outlaw lacks sufficient knowledge or information to form a belief as to the truth or falsity of the allegations contained in Paragraph 15, and thus denies the same.**

16.     Further, Plaintiffs' Major Clients require them to enter into confidentiality agreements to protect their own sensitive information and specific information regarding the work Plaintiffs perform for them and the specific terms and conditions of their agreements.  Violation of these conditions could bring significant harm to  Plaintiffs' reputation and ability to conduct business with these clients and others.

**Defendant Outlaw lacks sufficient knowledge or information to form a belief as to the truth or falsity of the allegations contained in Paragraph 16, and thus denies the same.**

17.     Plaintiffs have implemented a number of restrictions on their computer systems to protect their Confidential Information. Plaintiffs' first line of defense in regards to securing confidential and sensitive information is that the entirety of their network is behind Sophos XG firewalls. This system ensures that all data is encrypted and then transmitted when Plaintiffs' employees access this information from outside of their network.   Additionally, all communications between Plaintiffs' offices are performed using site-to-site VPN tunnels. Plaintiffs utilize Windows Server software to setup their file servers utilizing domain-level, access

restricted shares. Each of Plaintiffs' employees that have access to Plaintiffs' servers is assigned a user account with access to the minimal number of security groups as possible. By far, the majority of users have access only to Plaintiffs' General share which hosts information such as standard forms, telephone extension lists, branding information, etc. Plaintiffs' most sensitive, proprietary and competitive information is located on its Accounting and Project Management shares. These shares contain information such as pricing, proposals and bids, Master Service Agreements, Contracts, pricing model, cost information and invoices and all information relating to clients, including those Major Clients, which those clients require to maintained as confidential. Plaintiffs' Managers, Members and Project Managers who have a business-related reason to use the information to perform their jobs are allowed access to this information. This amounts to only a small fraction of Plaintiffs' workforce, but that small fraction included Outlaw. Company information that is considered to be even more sensitive than the information in these two shares, such as project profit and loss statements, owner distributions, and employee compensation information, is stored on the Corporate Share and can only be accessed by Integrity's Controller, Human Resources, and Members.

**Defendant Outlaw lacks sufficient knowledge or information to form a belief as to the truth or falsity of the allegations contained in Paragraph 17, and thus denies the same.**

18.     Plaintiffs' Confidential Information is known by employees to be extremely sensitive and crucial to the business and is not to be shared with competitors or the general public. Plaintiffs ensure that their employees are aware of the crucial competitive importance of their Confidential Information through dissemination of their written policies in their Employee

Handbook and by requiring employees with access to sensitive business information to sign confidentiality and noncompetition agreements as discussed herein. Plaintiffs' Senior Members also routinely make clear during Member Calls and Meetings that the information discussed and shared is confidential and should be treated as such.

**Denied.**


19. Given the nature of Defendant's position with Plaintiffs, and in reliance on Defendant's representations, his contractually binding agreements with Plaintiffs, and his agreement to abide by Plaintiffs' Company policies, and that he would use this information only in furtherance of his job duties and Plaintiffs' business, Plaintiffs entrusted Defendant with ever-increasing access to their Confidential Information, as discussed in more detail herein.

**Denied.**


### Defendant Outlaw's Employment and Contractual Obligations

20. Outlaw was initially hired by JJAM in March, 2012 as an Entry Level O&M and LFG Field Technician to work out of its offices in Tampa, Florida and Monroe, North Carolina.

- **Defendant Outlaw denies that he was initially hired by JJAM in March 2012.**

- **Defendant Outlaw admits that his initial role with CEC was as an entry level O&M and LFG Field Technician.**

- **Defendant Outlaw denies working out of a JJAM office in Tampa, Florida and denies working out of a JJAM office in Monroe, North Carolina.**

- **Except as expressly admitted herein, all other allegations in Paragraph 20 are hereby denied.**

## Employee Handbook Policies

21.     Upon commencement of his employment, Outlaw signed two forms acknowledging his receipt of JJAM's 2011 version of its Employee Handbook.  A copy of the receipt forms are attached hereto and incorporated by reference collectively as **Exhibit A**.

- **Defendant Outlaw denies signing a form acknowledging receipt of a JJAM Handbook.**

- **Defendant Outlaw admits signing the Carlson Environmental Consultants (CEC) handbook acknowledgement attached as Exhibit A.**

- **Except as expressly admitted herein, all other allegations in Paragraph 21 are hereby denied.**

22.     The 2011 Employee Handbook contained several policies that are relevant to this lawsuit.  First, the Computer Policy provides, in pertinent part, that "Computers are provided by [JJAM] for employees to perform [JJAM] business."  Second, the Confidentiality policy provides:

> Employees of [JJAM] may be exposed to confidential information intended for the Company's use only or that of our clients.  All employees are required to maintain such information in strictest confidence.  Employees may be required to sign a confidentiality agreement with [JJAM].  This policy benefits you, as an employee, by protecting the interests of [JJAM] and our clients in the safeguard of confidential, unique and valuable information from competitors or others.

Third, the Conflicts of Interest policy provides that "No employee may make improper use of company or client resources, or permits others to do so." Copies of these policies are attached hereto and incorporated by reference collectively as **Exhibit B**.

**Defendant Outlaw acknowledges that the document speaks for itself but denies any incorrect conclusions Plaintiffs draw therefrom. Except as expressly admitted herein, all other allegations in Paragraph 22 are hereby denied.**

23.     In 2020, JJAM issued an updated Employee Handbook, and Outlaw signed a receipt acknowledgment form for that version, a copy of which is attached hereto and incorporated by reference as **Exhibit C**. A few of the policies which are relevant to this lawsuit are as follows:

**5-1. Workplace Conduct**: This policy provides several examples of unacceptable conduct in the workplace, including "Stealing, removing or defacing [company] property . . . and/or disclosure of confidential information."

**5-3. Use of Communication and Computer Systems:** This policy provides that "communication and computer systems are intended for business purposes and may be used only during working time."

**5-10. Confidential Company Information:** This policy provides as follows:

During the course of work, an employee may become aware of confidential information about [JJAM's] business, including but not limited to information regarding Company finances, pricing, products and new product development, software and computer programs, marketing strategies, suppliers, customers and potential customers. An employee also may become aware of similar confidential information belonging to [JJAM's] clients. It is extremely important that all such information remain

confidential, and particularly not be disclosed to our competitors. Any employee who improperly copies, removes (whether physically or electronically), uses or discloses confidential information to anyone outside of [JJAM] may be subject to disciplinary action up to and including termination. Employee may be required to sign an agreement reiterating these obligations.

Copies of these policies are attached hereto and incorporated by reference as **<u>Exhibit D</u>**.

**Defendant Outlaw denies that JJAM issued an updated Employee Handbook in 2020 and denies that Defendant Outlaw signed a JJAM Employee handbook in 2020. Defendant Outlaw acknowledges that the documents speak for themselves but denies any incorrect conclusions Plaintiffs draw therefrom. Except as expressly admitted herein, all other allegations in Paragraph 23 and all its subparts are hereby denied.**

## 2020 Confidentiality and Noncompetition Agreement

24.     On April 1, 2020, Outlaw entered into the Noncompete Agreement with JJAM in connection with Outlaw's subscription for shares and in consideration of payment to him of $500. A copy of the Noncompete Agreement is attached hereto and incorporated by reference as **<u>Exhibit E</u>**.

**Defendant Outlaw denies entering into a Noncompete Agreement with JJAM in 2020.**

**Defendant Outlaw admits that he signed the document attached as Exhibit E. Except as expressly admitted herein, all other allegations in Paragraph 24 are hereby denied.**

25.     In the Noncompete Agreement, Outlaw agreed not to use or disclose [JJAM's] Confidential Information except in the performance of his job duties, he agreed not to compete against [JJAM] for a period of one year following his resignation or termination (the "**Restricted Period**") in the defined Restricted Territory; and he agreed not to solicit [JJAM's] customers or employees during the Restricted Period.

**Defendant Outlaw acknowledges that the document speaks for itself but denies any incorrect conclusions Plaintiffs draw therefrom.  Except as expressly admitted herein, all other allegations in Paragraph 25 are hereby denied.**

26.     Section 3 of the Noncompete Agreement contains the Confidential Information nondisclosure provision.   Outlaw agreed that "the business of providing specialty engineering, operations and maintenance, and construction services to the solid waste industry is highly competitive and involves the use of trade secrets and other proprietary and confidential information of the employer" and that if any such information were disclosed to a competing business or used in an unauthorized manner it would cause immediate and irreparable harm to JJAM and would give a competing business an unfair advantage against JJAM.

**Defendant Outlaw acknowledges that the document speaks for itself but denies any incorrect conclusions Plaintiffs draw therefrom.  Except as expressly admitted herein, all other allegations in Paragraph 26 are hereby denied.**

27.     Outlaw acknowledged that, by virtue of his position with JJAM , he would have access to JJAM's Confidential Information, which is defined to include the following: "information concerning the Employer's discoveries, ideas, conceptions, formulas, mask works, licensed technologies and software, information, innovations, inventions, methods, processes, apparatuses, devices, products, techniques, technologies, and improvements thereto and physical manifestation thereof; information concerning the nature of Employer's business and their manner of operation, financial and accounting information, such as cost, pricing and billing information, customer profiles, financial policies and procedures, revenues and profit margins; sales and marketing information, such as sales strategies and programs, and information concerning Employer's customers and customer lists; Company policies and procedures; information concerning Employer's business relationships with persons, firms, corporations and other entities; and other internal business information of Employer."

**Defendant Outlaw admits that the language quoted in Paragraph 27 appears in an April 2020 "Confidentiality and Noncompetition Agreement" between Defendant Outlaw and CEC.  Defendant acknowledges that such document speaks for itself but denies any incorrect conclusions Plaintiffs draw therefrom.  Except as expressly admitted herein, all other allegations in Paragraph 27 are hereby denied.**

28.     Outlaw agreed that such Confidential Information is a valuable and unique asset of JJAM , and that he will not at any time or in any manner, directly or indirectly, divulge, disclose or communicate any such Confidential Information to any person, firm, corporation or other entity for any reason without the prior express, written consent of JJAM  unless such information: (i) is in the public domain through no wrongful act of Outlaw; (ii) has been rightfully received from a third party without restriction and without breach of this Agreement; or (iii) except as may be required by law.

**Defendant Outlaw admits that Paragraph 28 references language appearing in an April 2020 "Confidentiality and Noncompetition Agreement" between Defendant Outlaw and CEC.  Defendant Outlaw acknowledges that such document speaks for itself but denies any incorrect conclusions Plaintiffs draw therefrom.  Except as expressly admitted herein, all other allegations in Paragraph 28 are hereby denied.**

29.     Section 4 of the Noncompete Agreement contains the Covenant Not to Compete restrictive covenants.   In Sections 4.c. and 4.d., Outlaw agreed that this covenant was necessary "to protect Employer from unfair competition, and to prevent the unauthorized disclosure or use of Employer's Confidential Information."   In this Section, Outlaw agreed, among other things, that, during the Restricted Period, defined as one (1) year following his separation from employment, he would not provide or perform services identical to those he provided to JJAM  for himself or for a Competitor (defined to mean any person or business entity that provides specialty

engineering, operations and maintenance, and construction services to the solid waste industry that provides or performs those services in the same geographical areas and/or to a substantially similar customer base serviced by JJAM) in the Restricted Territory (defined as the United States, and various separate tiers as set forth therein). This provision does not prohibit Outlaw from working for a Competitor in an area of business that does not compete with JJAM.

**Defendant Outlaw admits that Paragraph 29 references language appearing in an April 2020 "Confidentiality and Noncompetition Agreement" between Defendant Outlaw and CEC. Defendant Outlaw acknowledges that such document speaks for itself but denies any incorrect conclusions Plaintiffs draw therefrom. Except as expressly admitted herein, all other allegations in Paragraph 29 are hereby denied.**

30. In Section 4.e of the Noncompete Agreement, Outlaw further agreed not to hire, employ, solicit or attempt to solicit or induce JJAM's employees during the Restricted Period to leave their employment with Integrity or to violate any confidentiality agreement, nondisclosure agreement or any other restrictive covenant or employment agreement with Integrity.

**Defendant Outlaw admits that Paragraph 30 references language appearing in an April 2020 "Confidentiality and Noncompetition Agreement" between Defendant Outlaw and CEC. Defendant Outlaw acknowledges that such document speaks for itself but denies any incorrect conclusions Plaintiffs draw therefrom. Except as expressly admitted herein, all other allegations in Paragraph 30 are hereby denied.**

31.     In Section 5 of the Noncompete Agreement, Outlaw agreed not to solicit JJAM's Customers during the Restricted Period.  Outlaw acknowledged that JJAM's business relationships with their Customers have been developed through significant effort by JJAM and that their Customers are vital to the success of the Company, and that their communications and business dealings with their customers constitute Confidential Information.

**Defendant Outlaw admits that Paragraph 31 references language appearing in an April 2020 "Confidentiality and Noncompetition Agreement" between Defendant Outlaw and CEC.  Defendant Outlaw acknowledges that such document speaks for itself but denies any incorrect conclusions Plaintiffs draw therefrom.  Except as expressly admitted herein, all other allegations in Paragraph 31 are hereby denied.**

32.     Outlaw also agreed that JJAM would be "entitled as a matter of right to injunctive relief" upon any breach or threatened breach of Outlaw's obligations in the Noncompete Agreement.

**Defendant Outlaw admits that Paragraph 32 references language appearing in an April 2020 "Confidentiality and Noncompetition Agreement" between Defendant Outlaw and CEC.  Defendant Outlaw acknowledges that such document speaks for itself but denies any incorrect conclusions Plaintiffs draw therefrom.  Except as expressly admitted herein, all other allegations in Paragraph 32 are hereby denied.**

33.     Outlaw also agreed in Section 11 of his Noncompete Agreement that "Any period of violation of this Agreement which results in legal action to enforce same shall toll the period of time in which Employee shall be restricted hereunder, so that such Restricted Period shall begin and be in full force and effect from the date of such enforcement."

**Defendant Outlaw admits that Paragraph 33 references language appearing in an April 2020 "Confidentiality and Noncompetition Agreement" between Defendant Outlaw and CEC. Defendant Outlaw acknowledges that such document speaks for itself but denies any incorrect conclusions Plaintiffs draw therefrom. Except as expressly admitted herein, all other allegations in Paragraph 33 are hereby denied.**

## 2024 Operating Agreement

34.     On June 5, 2024, in conjunction with the reorganization and rebranding of CEC to Integrity, the CEC shareholders, specifically including Outlaw, contributed their CEC shares to Integrity for equivalent ownership interest in the newly-formed Integrity entity, and upon becoming Members of Integrity, entered into the Operating Agreement for Integrity (and Integrity subsequently caused its now wholly-owned subsidiary CEC to change its name to JJAM STAND, LLC). The Operating Agreement contains restrictive covenants which apply to each of Integrity's Members, including a Confidential Information non-disclosure provision, a covenant not to compete while a Member and for 1 year following termination of membership, and a customer and employee non-solicitation provision. An excerpt of the noncompete and restrictive covenants in the Operating Agreement are attached hereto and incorporated by reference as **Exhibit F**.

Defendant Outlaw admits that he entered into the Operating Agreement for Integrity and that such document speaks for itself, but denies any incorrect conclusions Plaintiffs draw therefrom. Except as expressly admitted herein, all other allegations in Paragraph 34 are hereby denied.

35.     The content of the foregoing restrictive covenants is largely identical to those contained in the 2020 Noncompete Agreement (Exhibit E) with one significant difference: Members are prohibited from disclosing Confidential Information, competing, and soliciting customers and employees while they are Members, and the 1 year "post-employment" Restricted Period does not commence until termination of the membership relationship with Integrity.

Defendant Outlaw acknowledges that the documents speak for themselves but denies any incorrect conclusions Plaintiffs draw therefrom. Except as expressly admitted herein, all other allegations in Paragraph 35 are hereby denied.

36.     On February 14, 2025, Integrity, in good faith, completed the redemption of Outlaw's ownership interest in Integrity, and therefore the one-year Restricted Period contained in the restrictive covenants in the Operating Agreement was triggered on that date.  Up until that time, Outlaw remained bound by the restrictions placed on Members in the Operating Agreement.

Defendant Outlaw admits that Integrity redeemed his ownership interest in Integrity on or about February 14, 2025.  Except as expressly admitted herein, all other allegations in Paragraph 36 are hereby denied.

37.     From his hiring in 2012 until his resignation in October 2024, Outlaw's job duties,

responsibilities and the trust placed in him by Plaintiffs grew significantly.

**Defendant Outlaw admits that from his hiring until resignation, his job duties and**

**responsibilities grew.  Except as expressly admitted herein, all other allegations in Paragraph**

**37 are hereby denied for lack of sufficient information.**

38.     When he was first hired in 2012, Outlaw first served as an O&M Technician, and

in that position he worked throughout the Southeastern United States for clients in the solid waste

sector conducting operations, maintenance and monitoring duties for landfill gas systems,

permitting and compliance, renewable natural gas, solid waste and gas system construction, and

construction quality assurance.   In this position, Outlaw was to monitor gas extraction wells on

several active landfills and to adjust gas extraction rates accordingly, and to perform gas system

Construction Quality Assurance ("**CQA**") and non-routine construction services at various solid

waste facilities around the Southeast.

- **Defendant Outlaw admits that when he was first hired in 2012, he served as an O&M**
  **Technician.**

- **Defendant Outlaw admits that in that position he worked throughout the**
  **Southeastern United States for clients in the solid waste sector conducting**
  **operations, maintenance and monitoring duties for landfill gas systems, solid waste**
  **and gas system construction, and construction quality assurance.**

- **Defendant Outlaw denies that in that position he was involved in permitting and compliance and renewable natural gas.**

- **Defendant Outlaw admits that in that position, he was to monitor gas extraction wells on several active landfills and to adjust gas extraction rates accordingly, and to perform gas system Construction Quality Assurance ("<u>CQA</u>") and non-routine construction services at various solid waste facilities around the Southeast.**

- **Except as expressly admitted herein, all other allegations in Paragraph 38 are denied.**

39.     In 2013, Outlaw was promoted to the position of O&M Field Manager.  The job duties of this position were similar to his first role, except he had increased responsibility as a manager, including supervising several technicians and specific responsibility for O&M at several specific landfill sites in the Southeastern United States.  As he assumed this role, Outlaw began to write proposals and invoices, purchase equipment and supplies, engage in client relations, address more complex problems and analyze landfill data.

- **Defendant Outlaw denies that in 2013 he was promoted to the position of O&M Field Manager.**

- **Defendant Outlaw admits that in 2013 he had specific responsibility for O&M at several specific landfill sites in Florida, Georgia, and South Carolina.**

- **Defendant Outlaw denies that he "began to write proposals and invoices, purchase equipment and supplies, engage in client relations, address more complex problems and analyze landfill data."**

- **Except as expressly admitted herein, all other allegations in Paragraph 39 are denied.**

40.     In 2016, Outlaw became an O&M Director, otherwise known as a Senior O&M Manager.  In this role, Outlaw was responsible for supervising a larger team and managing and leading O&M  projects in the solid waste sector throughout the Southeast and mid-Atlantic states. In this expanded role, Outlaw was also required to support O&M, Engineering/Design, and construction and CQA services divisions.  In addition, his access to and use of JJAM's Confidential Information expanded significantly, as he became more directly involved with clients and client relations and had access to additional pricing information to enable him to prepare more complex client proposals and invoices.

- **Defendant Outlaw denies that in 2016, he became an O&M Director, otherwise known as a Senior O&M Manager.**

- **Defendant Outlaw denies that he was responsible for supervising a larger team and managing and leading O&M  projects in the solid waste sector throughout the Southeast and mid-Atlantic states.**

- **Defendant Outlaw denies that he was also required to support O&M, Engineering/Design, and construction and CQA services divisions.**

- **Defendant Outlaw denies that his access to and use of JJAM's Confidential Information expanded significantly, denies that he became more directly involved with clients and client relations and denies that he had access to additional pricing**

**information and denies that he prepared more complex client proposals and invoices.**

- **Except as expressly admitted herein, all other allegations in Paragraph 40 are hereby denied.**

41.     On April 1, 2020, Outlaw became a Shareholder of JJAM  and his access to Confidential Information grew exponentially, as he was now involved as an owner in highly confidential discussions and communications regarding unique company business practices that distinguished JJAM and gave it   a competitive advantage over its competitors, their plans for future expansion,  marketing plans and strategy, and other sensitive competitive information contained on the restricted access shares described above.

**Defendant Outlaw admits that he became a shareholder of CEC on or about April 1, 2020.  Except as expressly admitted herein, all other allegations in Paragraph 41 are hereby denied.**

42.     Specific examples of the Confidential Information Outlaw gained access to as a Shareholder included proposals and cost information, labor rates and discussions about JJAM's rates compared to competitors, employee survey results, business strategy, long term expansion, cost strategy for price increases, full client lists, salary information, bonuses paid to employees,

company financial information including profit & loss statements and balance sheets, and attorney-client privileged information regarding pending legal matters.

**Denied.**

43.     After becoming a Shareholder, Outlaw's job title became Principal, O&M Project Director, and he continued to perform his previous duties as O&M Director.  At this same time, Outlaw was granted authority to develop and lead JJAM's  Jet-Vac/environmental cleaning line of business which involves industrial and environmental cleaning services using high-pressure water jets to clean pipelines, sewers, manholes, forcemains, tanks, ponds and related structures and equipment.   Outlaw developed business plans, capital spending requests, and marketing strategies among other activities.

- **Defendant Outlaw admits that his title became O&M Director in 2020.**

- **Defendant Outlaw denies that "At this same time, [he] was granted authority to develop and lead JJAM's  Jet-Vac/environmental cleaning line of business which involves industrial and environmental cleaning services using high-pressure water jets to clean pipelines, sewers, manholes, forcemains, tanks, ponds and related structures and equipment."**

- **Defendant Outlaw denies that he developed business plans and marketing strategies.**

- **Defendant Outlaw admits that he developed capital spending requests.**

- **Except as expressly admitted herein, all other allegations in Paragraph 43 are hereby denied.**

44.     Plaintiffs have invested significant capital in Jet-Vac services which have become a significant part of their business and allowed them to begin providing these services to businesses in the industrial and utility sectors, including, most importantly, Major Client C, which has become Plaintiffs' third largest client since the inception of the Jet-Vac business.  Outlaw marketed Plaintiffs' Jet-Vac business in a large number of states east of the Mississippi.

**Defendant Outlaw lacks sufficient knowledge or information to form a belief as to the truth or falsity of the allegations contained in Paragraph 44, and thus denies the same.**

45.     After becoming an owner, Outlaw participated in owner meetings and retreats, where the company's equity holders would discuss overall company performance in the previous year and performance of each specific division/business line, plans for the coming year, strategic decisions to grow their business, financial information, upcoming and pending job bids, and other confidential business information.

- **Defendant Outlaw admits that after he became an owner, he participated in owner meetings and retreats.**

- **Defendant Outlaw admits during such meetings and retreats, the company's equity holders would discuss overall company performance in the previous year and performance of each specific division/business line.**

- **Defendant Outlaw denies that plans for the coming year and strategic decisions to grow the business were regularly discussed.**

- **Defendant Outlaw admits that upcoming and pending job bids were discussed at**

*Integrity et al v. Outlaw et al*
Defendant Outlaw's Affirmative Defenses and Answer to Amended Complaint

**owner meetings and retreats.**

- **Defendant Outlaw lacks sufficient information to form an opinion as to whether other confidential business information was discussed at owner meetings and retreats and thus denies the same.**

- **Except as expressly admitted herein, all other allegations in Paragraph 45 are hereby denied.**

46.     Indeed, in the 2021 Retreat, Outlaw was responsible for preparing and presenting to the group regarding the O & M Group and opportunities for developing and expanding the company's Jet-Vac business across the United States.  Thereafter, in each owner meeting, Outlaw gave presentations regarding the Jet-Vac business, the performance of that division, current and pending projects and related items.

- **Defendant Outlaw denies that in the 2021 Retreat, he was responsible for preparing and presenting to the group regarding the O & M Group and opportunities for developing and expanding the company's Jet-Vac business across the United States.**

- **Defendant Outlaw denies that in each owner meeting following the 2021 Retreat, he gave presentations regarding the Jet-Vac business, the performance of that division, current and pending projects and related items.**

- **Except as expressly admitted herein, all other allegations in Paragraph 46 are hereby denied.**

47.     As referenced above, on June 5, 2024, Outlaw became a Member in the newly-formed entity Integrity, and JJAM became a wholly-owned subsidiary of Integrity.  Thereafter, Outlaw continued to perform the duties he performed for JJAM referenced above and to have high-level access to Plaintiffs' Confidential Information and trade secrets.

- **Defendant Outlaw admits that "…on June 5, 2024, [he] became a Member in the newly- formed entity Integrity,**

- **Defendant Outlaw lacks sufficient knowledge or information to form a belief as to the truth or falsity of whether "…JJAM became a wholly-owned subsidiary of Integrity…" and thus denies the same**

- **Defendant Outlaw denies that "…[t]hereafter, [he] continued to perform the duties he performed for JJAM referenced above**

- **Defendant Outlaw denies "high- level access to Plaintiffs' Confidential Information and trade secrets."**

- **Except as expressly admitted herein, all other allegations in Paragraph 47 are hereby denied.**

48.     In the June 2024 Integrity Members' meeting, the Members in attendance, which included Outlaw, discussed in detail the Plaintiffs' future expansion and growth plans designed to give it an advantage over their competitors.  This information was extremely sensitive and was therefore only shared with Integrity Members, who were expected to be loyal to the company and protect their interests by keeping the information confidential.

- **Defendant Outlaw lacks sufficient knowledge or information to form a belief as to the truth or falsity of whether he attended the June 2024 Integrity Members' meeting and thus denies the same.**

- **Defendant Outlaw denies that at the June 2024 Integrity Members' meeting, "…the Members in attendance…discussed in detail the Plaintiffs' future expansion and growth plans designed to give it an advantage over their competitors.**

- **Defendant Outlaw denies that information discussed was extremely sensitive and was therefore only shared with Integrity Members, who were expected to be loyal to the company and protect their interests by keeping the information confidential.**

- **Except as expressly admitted herein, all other allegations in Paragraph 48 are hereby denied.**

49.     In this same meeting, the Members discussed revision of the recently- approved Operating Agreement, which included a discussion of its noncompete provisions. During the meeting, Outlaw stated his flawed belief that noncompetes were no longer valid due to the Federal Trade Commission's recently-proposed, but not enacted, rule banning some noncompete agreements.  One or two weeks after this meeting, Outlaw sent Jim Christiansen one of the slides from his PowerPoint presentation that addressed noncompetes and added some comments.   One of Outlaw's comments regarding noncompetes was very telling:

> I just don't think these agreements are worth a damn anymore, I think if you treat people with dignaty (sic) and respect and pay them well and provide them with opportunities to grow, they will not leave.  If they do . . . we cannot own people they have free will, *such that they don't poach and steal after leaving*.

(Emphasis added). A copy of the foregoing PowerPoint slide and Outlaw's comments is attached hereto and incorporated by reference as **Exhibit G**.   Outlaw tendered his resignation two months later.

- **Defendant Outlaw admits that he tendered his resignation in October of 2024.**

- **Except as expressly admitted herein, Defendant Outlaw lacks sufficient knowledge or information to form a belief as to the truth or falsity of the allegations contained in Paragraph 49 and thus denies the same.**

**Outlaw Conspires with a Direct, National Competitor to Misappropriate Integrity's
Confidential Information and Violate his Noncompete Agreement**

50.     On July 5, 2024, an announcement was made that two of Plaintiffs' competitors in
the O&M and Jet-Vac business, respectively - Monitoring, Control and Compliance ("**MCC**") and
Biovac Industrial Services ("**Biovac**")- had merged to form a new entity called LFG Service
Partners, Inc. ("**LFGSP**").   LFGSP would provide both services and therefore more directly
compete against Plaintiffs in a broader range of services and in a larger service territory.   The
merger announcement stated as follows:

> The combined company aims to expand its footprint and scope of services,
> leveraging the vast experience and expertise of both brands.  LFG Service Partners,
> Inc. will be headquartered in Wadsworth, Ohio and will focus on providing
> enhanced service offerings in landfill gas (LFG) and biogas sector management, as
> well as industrial cleaning solutions. With a larger team and pooled resources, the
> new entity is poised to set new standards in service excellence and operational
> efficiency across the industry.

**Defendant Outlaw lacks sufficient knowledge or information to form a belief as to the
truth or falsity of the allegations contained in Paragraph 50, and thus denies the same.**

51.     On or about this same time, Integrity was formulating a new multi-year O&M
proposal for their second largest client, Major Client B, which would generate millions of dollars
in annual revenues over the term of the agreement.  Integrity submitted a bid to perform O&M
work in the regions where it had historically performed such work for Major Client B. Upon
information and belief, LFGSP and its predecessor companies had never submitted bids seeking
to compete head-to-head with JJAM or Integrity to perform O&M work in these same areas, until
these bids were submitted.  Upon information and belief, this was also the first time that LFGSP

or its predecessor companies had ever been awarded any work in those areas where JJAM or Integrity performed these services for Major Client B.

**Defendant Outlaw lacks sufficient knowledge or information to form a belief as to the truth or falsity of the allegations contained in Paragraph 51, and thus denies the same.**

52.     On August 7, 2024, Plaintiffs  held a Members' meeting.  During this meeting, a number of highly confidential items regarding company plans and strategies, corporate financial information, employee surveys, and similarly confidential matters were discussed.

**Defendant Outlaw lacks sufficient knowledge or information to form a belief as to the truth or falsity of Plaintiffs' claim that "[o]n August 7, 2024, Plaintiffs held a Members' meeting.  Except as expressly admitted herein, all other allegations in Paragraph 52 are denied.**

53.     On or about this same time, Outlaw began to talk to LFGSP about potential employment opportunities.

**Denied.**

54.     During these conversations, Outlaw provided LFGSP with a copy of his Noncompete Agreement and, upon information and belief, the 2024 Operating Agreement. LFGSP was therefore fully aware of the restrictive covenants by which Outlaw was bound and which prohibited him from accepting employment with LFGSP to perform the same O & M and Jet-Vac duties he performed for Plaintiffs.

**Defendant Outlaw admits that he provided LFGSP with a copy of his Noncompete Agreement. Except as expressly admitted herein, all other allegations in Paragraph 54 are denied for lack of knowledge and information.**

55.     Despite LFGSP's knowledge of Outlaw's restrictive covenants, LFGSP made Outlaw an offer of employment on or before October 3, 2024, which Outlaw accepted.

**Defendant Outlaw lacks sufficient knowledge or information to form a belief as to the truth or falsity of the allegations in Paragraph 55 and thus denies the same.**

56.     On October 3, 2024, Outlaw suddenly resigned from Plaintiffs through a letter of resignation providing two weeks' notice. A copy of Outlaw's resignation letter is attached hereto and incorporated by reference as **<u>Exhibit H</u>**.

**Defendant admits that he tendered his resignation on or about October 3, 2024 by means of a letter providing two weeks' notice. Defendant Outlaw denies that providing two**

weeks' notice constitutes "suddenly" resigning. Except as expressly admitted herein, all other allegations in Paragraph 56 are hereby denied.

57.     At the time of his resignation, Plaintiffs asked Outlaw about his future plans. Outlaw falsely represented that he would not be competing against Plaintiffs and would be joining a small "Mom and Pop" jet-vac company based in the Midwest.

**Denied.**

58.     Outlaw's actual last day of employment was October 22, 2024.

**Defendant Outlaw admits that his last day of employment with Integrity was October 22, 2024.**

59.     Contrary to Outlaw's representations, Plaintiffs discovered in late December, 2024 that Outlaw was actually employed as Vice President for LFGSP performing the same Jet-Vac services he performed for Plaintiffs based out of the Tampa, Florida area, where he was based during his employment with Plaintiffs . A screenshot of his LinkedIn profile page reflects this and is attached hereto and incorporated by reference as **<u>Exhibit I</u>**.

- **Defendant Outlaw lacks sufficient knowledge or information to form a belief as to the truth or falsity of whether or when Plaintiffs learned of Defendant Outlaw's current employment.**

- **Defendant Outlaw denies that he is employed as Vice President for LFGSP.**

- **Defendant Outlaw admits that as of December 2024 he was performing industrial cleaning services for BioVac in the Midwest.**

- **Defendant Outlaw admits that the document attached as Exhibit I speaks for itself but denies any incorrect conclusions Plaintiffs draw therefrom.**

- **Except as expressly admitted herein, all other allegations in Paragraph 59 are hereby denied.**

60.     Upon information and belief, Outlaw has been employed with LFGSP since his resignation from Plaintiffs and is providing the same Jet-Vac services he previously performed for Plaintiffs within the Restricted Territory, in direct violation of his Noncompete Agreement and Operating Agreement.

- **Defendant Outlaw denies that he has been employed with LFGSP since his resignation from Plaintiffs.**

- **Defendant Outlaw denies that he was providing the same Jet-Vac services he previously performed for Plaintiffs within the Restricted Territory.**

- **Defendant Outlaw denies that he violated the Noncompete Agreement and Operating Agreement.**

*Integrity et al v. Outlaw et al*
Defendant Outlaw's Affirmative Defenses and Answer to Amended Complaint

- **Except as expressly admitted herein, all other allegations in Paragraph 60 are hereby denied.**

61.     Upon information and belief, Outlaw has been directly or indirectly involved in the solicitation of numerous employees of Plaintiffs by LFGSP officers and employees and recruiters engaged by LFGSP to conceal his involvement and violation of his non-solicitation obligations. In November-December, 2024 time frame, the last individuals holding the following positions with Plaintiffs have been called on their personal cell phones, which Outlaw knew or had access to, by recruiters working for LFGSP: O&M Director in Florida, O&M Manager in Charlotte, a Member and O&M Director, an O&M Technician, an O&M Field Manager, and a PE Senior Project Director. Multiple gas technicians and construction employees have been solicited directly by LFGSP and recruiters. The O&M Manager referenced above accepted the job for which he was solicited and is presently working for LFGSP. Finally, on February 11, 2025, LFGSP's CEO James Baird reached out directly to the former manager of Integrity's Hickory, North Carolina jet-vac office through LinkedIn.

**Denied.**

62.     Since his resignation from Plaintiffs, Outlaw has failed and refused to abide by the provisions of his Noncompete Agreement and the Operating Agreement restrictive covenants, including working for a competitor while still being a Member of Integrity, and he continues to be employed by LFGSP performing the identical services he provided to Integrity in competition with Plaintiffs within the Restricted Territory.

**Denied.**

63.     On December 20, 2024, Plaintiffs, through counsel, sent Outlaw a cease and desist letter, reminding Outlaw of his obligations to Plaintiffs under the Noncompete Agreement and the Operating Agreement and notifying him that it had discovered that he had lied to Plaintiffs about his future plans and was in fact directly competing against Plaintiffs with a major national competitor in violation of the provisions of both agreements. A copy of the cease-and-desist letter is attached hereto and incorporated by reference as **<u>Exhibit J</u>**.

**Defendant acknowledges that the letter speaks for itself but denies its veracity and denies any incorrect conclusions Plaintiffs draw therefrom. Except as otherwise admitted herein, all other allegations in Paragraph 63 are hereby denied.**

64.     Outlaw claims that he is not violating his restrictive covenants because he is "siloed" and is only performing Jet-Vac work for LFGSP's affiliate Biovac in geographic areas where Plaintiff does not provide these services, but, like many of Outlaw's representations, this is not true.

- **Defendant Outlaw admits that he is not violating his restrictive covenants**
- **Defendant Outlaw denies that "like many of Outlaw's representations, this is not true."**
- **Except as expressly admitted herein, all other allegations in Paragraph 64 are hereby denied.**

65.     As stated above, during his employment with Plaintiffs, Outlaw was deeply involved in the operation of Plaintiffs' O&M services and later started and managed Plaintiffs' Jet-Vac Services. In Plaintiffs' business, Jet-Vac is not only a logical outgrowth of O&M, but the two services operate in tandem and are dependent on one another, and, indeed, many, if not most, bid proposals are for the provision of both O&M and Jet-Vac services.  Plaintiffs have their O&M personnel go to landfill sites to perform set up services – such as adding pipes for cleaning, removing pumps, conducting gas studies before and after jetting, determining clog locations, and providing an access plan for the jetting  – prior to provision of the Jet-Vac services.  Due to their expertise in O&M, Plaintiffs have the ability to provide this full array of services which gives them a competitive advantage over competitors such as LFGSP, which does not operate these services in the same manner.

- **Defendant Outlaw denies that he was "deeply involved" with O&M for the duration of his employment with Plaintiffs**

- **Defendant Outlaw admits that he started and managed Plaintiffs' Jet-Vac services.**

- **Defendant Outlaw denies that "…[i]n Plaintiffs' business, Jet-Vac is not only a logical outgrowth of O&M, but the two services operate in tandem and are dependent on one another, and, indeed, many, if not most, bid proposals are for the provision of both O&M and Jet-Vac services."**

- **Defendant Outlaw admits Plaintiffs did O&M work before and after jetting.**

- **Defendant Outlaw lacks sufficient knowledge or information to form a belief as to the truth or falsity of the allegation that "Due to their expertise in O&M, Plaintiffs have the ability to provide this full array of services which gives them a competitive advantage over competitors such as LFGSP, which does not operate these services in the same manner," and thus denies the same.**

- **Except as expressly admitted herein, all other allegations in Paragraph 65 are hereby denied.**

66.     Outlaw is in a position to utilize Plaintiffs' Confidential Information he learned through his significant involvement in their O&M and Jet-Vac services, and which he misappropriated prior to his resignation, to position LFGSP to use Plaintiffs' methods of bidding and providing these services to rapidly solicit and divert the business of Plaintiffs' O&M and Jet-Vac clients, even though he claims to be involved only in Jet-Vac at LFGSP.  Indeed, Outlaw has begun to solicit Plaintiffs' Major Clients through social media for this very purpose.

- **Defendant Outlaw denies that he "…is in a position to utilize Plaintiffs' Confidential Information he learned through his significant involvement in their O&M and Jet-Vac services"**

- **Defendant Outlaw denies that he misappropriated any Confidential Information prior to his resignation**

- **Defendant Outlaw denies that he "…has begun to solicit Plaintiffs' Major Clients through social media for this very purpose."**

- **Except as expressly admitted herein, all other allegations in Paragraph 66 are hereby denied.**

67.     In mid-January 2025, Plaintiffs conducted a forensic analysis of the computer used by Outlaw during his employment.  The forensic analysis revealed that between October 15 and October 22, and especially on his last day of employment with Plaintiffs, Outlaw was on a frantic mission to access both the Accounting Drive and Corporate Drive and transfer for his use in competition with Plaintiffs every single file, spreadsheet, proposal or any other data that contained

the most sensitive Confidential Information belonging to Plaintiffs. During this time, Outlaw connected several external hard drives that did not belong to Plaintiffs to his laptop computer as he accessed a highly confidential line of recent business proposals, Commissions and Sales information, Purchase Order numbers relating to 2024 projects, information regarding several pending and upcoming projects for Major Clients and other long-time customers, Bid sheets for pending projects, Jet-Vac schedules, time ledgers, owner bonus pools, various sensitive internal administrative reports, and August 31, 2024 Member input on the Operating Agreement. As explained in more detail below, the brief amount of time Outlaw spent opening and accessing these files reflects that he was transferring Plaintiffs' Confidential Information to the unauthorized external hard drives, instead of reviewing the files for some legitimate purpose.

- **Defendant Outlaw lacks sufficient knowledge or information to form a belief about whether or when Plaintiffs conducted a forensic analysis of the computer Defendant Outlaw used during his employment and thus denies the same.**

- **Defendant Outlaw lacks sufficient knowledge or information to form a belief as to the outcome of any alleged forensic analysis.**

- **Defendant Outlaw denies that "between October 15 and October 22, and especially on his last day of employment with Plaintiffs, Outlaw was on a frantic mission to access both the Accounting Drive and Corporate Drive and transfer for his use in competition with Plaintiffs every single file, spreadsheet, proposal or any other data that contained the most sensitive Confidential Information belonging to Plaintiffs."**

- **Defendant Outlaw admits that, at the direction of Integrity's Chief Operations**

Officer Seth Nunes, he connected a thumb drive for the purpose of transferring files to Nick Ousterhoudt, his successor at Integrity.

- Defendant Outlaw denies that "…he accessed a highly confidential line of recent business proposals, Commissions and Sales information, Purchase Order numbers relating to 2024 projects, information regarding several pending and upcoming projects for Major Clients and other long-time customers, Bid sheets for pending projects, Jet-Vac schedules, time ledgers, owner bonus pools, various sensitive internal administrative reports, and August 31, 2024 Member input on the Operating Agreement.

- Defendant Outlaw denies that "the brief amount of time Outlaw spent opening and accessing these files reflects that he was transferring Plaintiffs' Confidential Information to the unauthorized external hard drives, instead of reviewing the files for some legitimate purpose."

- Except as expressly admitted herein, all other allegations in Paragraph 67 are hereby denied.

68. Outlaw systematically accessed approximately 276 files from October 15 to October 22, 2024. On October 16, Outlaw accessed 75 files **between 12:12 P.M. and 1:54 A.M**, which mainly consisted of 2024 Jet-Vac and Tank Cleaning Proposals for a number of customers. This activity also reveals that Outlaw had a file on his laptop entitled "matt backup from laptop/Proposals 2024." On October 20, Outlaw inserted an external USB device into his

computer **at 4:26 A.M**. On October 22, his last day at Integrity, Outlaw accessed 88 files containing highly sensitive Confidential Information **between 2:00 A.M. and 3:28 A.M.** including Major Client C's purchase orders, Plaintiffs' Operating Agreement, a PowerPoint presentation and input from Plaintiffs' Members from their recent Members' meeting, and proposals for the purpose of uploading, downloading, transferring and/or printing the same for his own use. Outlaw also accessed Integrity's accounting software program on several occasions. The brief amount of time each file remained open reflects that Outlaw was accessing them solely for the purpose of transferring those files to external storage or cloud storage.

- **Defendant Outlaw lacks sufficient knowledge or information to form a belief as to the truth or falsity of the allegation that "…Defendant systematically accessed approximately 276 files from October 15 to October 22, 2024. On October 16, Defendant accessed 75 files between 12:12 P.M. and 1:54 A.M, which mainly consisted of 2024 Jet-Vac and Tank Cleaning Proposals for a number of customers. This activity also reveals that Defendant had a file on his laptop entitled "matt backup from laptop/Proposals 2024." On October 20, Defendant inserted an external USB device into his computer at 4:26 A.M. On October 22, his last day at Integrity, Defendant accessed 88 files containing highly sensitive Confidential Information between 2:00 A.M. and 3:28 A.M. including Major Client C's purchase orders, Plaintiffs' Operating Agreement, a PowerPoint presentation and input from Plaintiffs' Members from their recent Members' meeting, and proposals for the purpose of uploading, downloading, transferring and/or printing the same for his own use. Outlaw also accessed Integrity's**

accounting software program on several occasions." and thus denies the same.

- Defendant Outlaw denies that "[t]he brief amount of time each file remained open reflects that Defendant was accessing them solely for the purpose of transferring those files to external storage or cloud storage."

- Except as expressly admitted herein, all other allegations in Paragraph 68 are hereby denied.

69.     The files Outlaw transferred relating to proposals would have contained extremely confidential information regarding Plaintiffs' forthcoming bid proposals to their Major Clients.

**Defendant Outlaw denies any wrongful transferal of files.   Except as expressly admitted herein, all other allegations in Paragraph 69 are denied.**

70.     Based upon the foregoing, the timing of Outlaw's misconduct, and his intentional misrepresentation regarding his future employment plans, Plaintiffs are informed and believe that Outlaw has misappropriated their Confidential Information, he has joined a direct competitor in violation of his noncompete obligations and is using and disclosing this sensitive competitive business information to LFGSP to allow it to unfairly compete against Integrity.

- **Defendant Outlaw denies any misconduct.**

- **Defendant Outlaw denies any misrepresentation of future employment plans.**

- **Defendant Outlaw lacks sufficient knowledge or information to form a belief as to Plaintiffs' information and beliefs and thus denies the same.**

- **Defendant Outlaw denies that "[Defendant Outlaw] has misappropriated [Plaintiffs'] Confidential Information, he has joined a direct competitor in violation of his noncompete obligations and is using and disclosing this sensitive competitive business information to LFGSP to allow it to unfairly compete against Integrity."**

- **Except as expressly admitted herein, all other allegations in Paragraph 70 are hereby denied.**


### First Cause of Action
### Breach of Contract – Violation of Noncompetition Covenants
### Against Defendant Outlaw

71. The allegations of Paragraphs 1 through 70 are hereby realleged and incorporated by reference as if fully set forth herein.

**Defendant Outlaw realleges and reincorporates by reference all previous responses, answers, and defenses as if fully set forth herein.**


72. Outlaw entered into two separate agreements with Plaintiffs – his 2020 Confidentiality and Noncompetition Agreement and the 2024 Operating Agreement (collectively "**Agreements**") - each of which contained restrictive covenants which were intended to protect Plaintiffs' legitimate business interests by prohibiting Outlaw from unfairly competing against Plaintiffs.

**Defendant Outlaw admits that he entered into the two identified agreements with Plaintiffs. Except as expressly admitted herein, all other allegations in this Paragraph are hereby denied.**

73. The foregoing Agreements are valid and binding contractual agreements between Plaintiffs and Outlaw.

**This Paragraph calls for a legal conclusion to which no response is required. To the extent this Paragraph contains allegations to which a response is required, Defendant Outlaw denies all such allegations.**

74. In these Agreements, Outlaw agreed not to, for a period of twelve months after the termination of his employment with Plaintiffs for any reason: compete against Plaintiffs within the Restricted Territory (as defined therein), directly or indirectly solicit Plaintiffs' employees to terminate their employment with Plaintiffs to become employed by a competitor, or to directly or indirectly solicit any Plaintiffs' customers to leave Plaintiffs and transfer their business to a competitor of Plaintiffs. Additionally, Outlaw agreed not to use or disclose Plaintiffs' Confidential Information except in furtherance of his job duties for Plaintiffs' benefit.

**Defendant Outlaw admits that the documents speak for themselves and objects to Plaintiffs' misquoting of the same. Defendant Outlaws denies any improper conclusions Plaintiffs draw from the aforementioned documents. Except as expressly admitted herein, all other allegations in Paragraph 74 are hereby denied.**

75. Outlaw has blatantly breached every one of these critical restrictive covenants by: misappropriating Plaintiffs' Confidential Information; becoming employed by competitor LFGSP within the Restricted Territory to perform the same job duties he performed while at Plaintiffs within the Restricted Period; using and disclosing Plaintiffs' Confidential Information in his new

competitive employment to divert corporate opportunities and to solicit the business of Plaintiffs' Customers and to encourage them to reduce the amount of business they provide to Plaintiffs; and directly or indirectly soliciting Plaintiffs' employees to leave their employment at Plaintiffs to become employed at LFGSP.

**Denied.**

76.     In addition to the foregoing, Outlaw has violated his Agreements by conspiring with LFGSP to use third parties as their proxies to solicit and provide competitive services to Plaintiffs' Clients specifically in order to avoid detection and to conceal Outlaw's violation of his Agreements through these actions. These efforts are intended, by design, to allow Outlaw and LFGSP an opening to solicit further business from these Clients of Plaintiffs and to divert and dilute the business those customers provide to the Plaintiffs.

**Denied.**

77.     By engaging in the foregoing conduct, Outlaw has materially breached, is breaching and, unless enjoined, will continue to breach the restrictive covenants in his Agreements.

**Defendant Outlaw denies having engaged in the aforementioned conduct and further denies breaching any restrictive covenants.  Except as expressly admitted herein, all other allegations in Paragraph 77 are  hereby denied.**

78.     As a proximate result of the Outlaw's breach, Plaintiffs have suffered, and will continue to suffer, substantial damages and loss.

**Defendant Outlaw denies any breach and denies that Plaintiffs have or will duffer damages. Except as expressly admitted herein, all other allegations in Paragraph 78 are denied.**

79.     Outlaw's actions were intentional, willful, outrageous, and malicious, and justify the imposition of exemplary damages.

**Denied.**

80.     Outlaw's material breach of his contractual obligations has caused and will continue to cause immediate and irreparable harm to Plaintiffs, and Plaintiffs' contractual rights must be protected.

**Defendant Outlaw denies any breach or material breach of contractual obligations and denies any harm has been or will be caused to Plaintiffs. Except as expressly admitted herein, all other allegations in Paragraph 80 are denied.**

81.     In his Agreements, Outlaw agreed to the entry of an injunction against him should he violate his restrictive covenants.

**Defendant Outlaw admits that the documents speak for themselves but denies any improper conclusions Plaintiffs draw therefrom. Except as expressly admitted herein, all other allegations in Paragraph 81 are hereby denied.**

82.     Plaintiffs are entitled to preliminary and injunctive relief against Outlaw as a result of the contractual violation set forth above. Outlaw's continued conduct as set forth above will cause irreparable harm to Plaintiffs.

**Denied.**


83.     Pursuant to Outlaw's Agreements, Plaintiffs are entitled to recover their reasonable attorneys' fees and costs associated with enforcing the restrictive covenants contained in the Agreements.

**Defendant Outlaw admits that the documents speak for themselves but denies their validity and enforceability.  Except as expressly admitted herein, all other allegations in Paragraph 83 are hereby denied.**


### Second Cause of Action
**Misappropriation of Trade Secrets in Violation of the North Carolina Trade Secrets Protection Act, N.C. Gen. Stat. § 66-152, *et. seq.***
<u>Against All Defendants</u>

84.     The allegations of Paragraphs 1 through 83 above are hereby realleged and incorporated by reference as if fully set forth herein.

**Defendant Outlaw realleges and reincorporates by reference all previous responses, answers, and defenses as if fully set forth herein.**

85.     The North Carolina Trade Secrets Protection Act ("**NCTSPA**"), N.C. Gen. Stat. §66-152 prohibits the misappropriation of trade secrets.

**Defendant Outlaw admits that the statute speaks for itself but denies its applicability to this matter. Except as expressly admitted herein, all other allegations in Paragraph 85 are hereby denied.**

86.     The NCTSPA defines "trade secret" as information that "derives independent actual or potential commercial value from not being generally known or readily ascertainable through independent development or reverse engineering by persons who can obtain economic value from the disclosure or use; and is the subject of efforts that are reasonable under the circumstances to maintain their secrecy."

**Defendant Outlaw admits that the statute speaks for itself but denies its applicability to this matter. Except as expressly admitted herein, all other allegations in Paragraph 86 are hereby denied.**

87.     The NCTSPA defines misappropriation as "acquisition, disclosure, or use of a trade secret of another without express or implied authority or consent, unless such trade secret was arrived at by independent development, reverse engineering, or was obtained from another person with a right to disclose the trade secret." Plaintiffs' Confidential Information, as defined above and including, among other things, labor and material costs, customer pricing, customer bids and

proposals, vendor cost information, customer preferences, business expansion plans, marketing strategies, and other compilations of sensitive business information constitute trade secrets under the NCTSPA.

**Defendant Outlaw admits that the statute speaks for itself but denies its applicability to this matter. Except as expressly admitted herein, all other allegations in Paragraph 87 are hereby denied.**

88.     Plaintiffs derive independent economic value from their Confidential Information because this information, compiled over their many years in business, gives Plaintiffs an edge over competitors who do not have this information and cannot simply create it out of whole cloth because they do not have the experience and history in the industry to do so.

**Denied.**

89.     Plaintiffs' trade secrets are related to products or services used in interstate commerce.

**Denied.**

90.     Outlaw was entrusted with Confidential Information in the performance of his job and in his role as an owner of the Plaintiffs.

**Denied.**

91.     Outlaw unlawfully, maliciously and in bad faith disclosed and/or used this Confidential Information for the benefit of Outlaw and his new employer, LFGSP, who is a competitor of Plaintiffs.

**Denied.**

92.     Upon information and belief, LFGSP was aware of, or became aware of, the Outlaw's misappropriation, use and disclosure of Plaintiffs' Confidential Information for their collective benefit in competing against Plaintiffs and soliciting Plaintiffs' customers and interfering with those long-term relationships that are so vital to Plaintiffs' business.

**Defendant Outlaw denies any misappropriation, unauthorized use, or disclosure of Plaintiffs' Confidential Information.   Except as expressly admitted herein, all other allegations in Paragraph 92 are denied.**

93.     Outlaw utilized this Confidential Information without Plaintiffs' express or implied consent, all to Plaintiffs' detriment.

**Denied.**

94.     LFGSP knowingly received, used and benefitted from the misappropriated Confidential Information provided to it by Outlaw

**Denied.**

95. As a direct and proximate result of Outlaw's actions, Plaintiffs have been damaged in an amount to be proven at trial.

**Denied.**

96. As a direct result of Defendants' actions, Plaintiffs have been harmed and continue to be harmed. Pursuant to N.C. Gen. Stat. §66-152, *et. seq.*, due to Outlaw's willful and malicious misappropriation, Plaintiffs are entitled to recover reasonable attorneys' fees.

**Defendant Outlaw denies any misappropriation and further denies willful or malicious misappropriation. Defendant Outlaw further denies that Plaintiffs suffered any harm. Except as expressly admitted herein, all other allegations in Paragraph 96 are hereby denied.**

### Third Cause of Action
**Computer Trespass/Computer Crimes**
**(N.C. Gen. Stat. § 14-454, et. seq.)**
Against Defendant Outlaw

97. The allegations of Paragraphs 1 through 96 above are hereby realleged and incorporated by reference as if fully set forth herein.

**Defendant Outlaw realleges and reincorporates by reference all previous responses, answers, and defenses as if fully set forth herein.**

98.     Outlaw used one or more computers to access Plaintiffs' computer network without authorization, for the purpose of copying and downloading their Confidential Information.

**Denied.**

99.     Outlaw accessed Plaintiffs' computer systems without authorization for his own personal benefit and the benefit of his new employer, LFGSP, to misappropriate Plaintiffs' Confidential Information and to use it to gain an unfair competitive advantage over Plaintiffs.

**Denied.**

100.     In so doing, Outlaw exceeded the right and permission to access Plaintiffs' computer system granted to him during his employment with Plaintiffs.

**Denied.**

101.     Outlaw's actions constitute violations of N.C. Gen. Stat. §§ 14-454, 14-455, 14-456 and 14-458.

**Denied.**

102.     As a direct and proximate cause of Outlaw's unauthorized access and trespass upon Plaintiffs' computer network, Plaintiffs have been damaged in an amount in excess of Twenty-Five Thousand Dollars ($25,000.00).

**Defendant Outlaw denies any unauthorized access or trespass upon Plaintiffs' computer network and denies Plaintiffs have been damaged. Except as expressly admitted herein, all other allegations in Paragraph 102 are denied.**

### Fourth Cause of Action
### Civil Liability for Theft by Employee
### (N.C. Gen. Stat. § 1-538.2)
Against Defendant Outlaw

103.     The allegations of paragraphs 1 through 102 are hereby realleged and incorporated by reference as if fully set forth herein.

**Defendant Outlaw realleges and reincorporates by reference all previous responses, answers, and defenses as if fully set forth herein.**

104.     N.C. Gen. Stat. § 1-538.2 provides a civil remedy for larceny by employees (N.C. Gen. Stat. § 14-74) and by virtue of employment (N.C. Gen. Stat. § 14-90).

**Defendant Outlaw admits that the cited statutes speak for themselves but denies their applicability in this matter. Except as expressly admitted herein, all other allegations in Paragraph 104 are hereby denied.**

105.    Outlaw's wrongful taking of Plaintiffs' Confidential Information, including digital and hard copies of the same, constitutes theft and/or embezzlement and entitles Plaintiffs to damages, consequential damages, punitive damages and attorney's fees as provided by N.C. Gen. Stat. § 1-538.2(a)(c1).

**Defendant Outlaw denies any wrongful taking of Plaintiffs' Confidential Information and denies Plaintiffs are entitled to any damages whatsoever.  Except as expressly admitted herein, all other allegations in Paragraph 105 are denied.**

### Fifth Cause of Action
### Violation of the Computer Fraud and Abuse Act
### (18 U.S.C. §§ 1030(a)(2)(C) and 1030(a)(5)(C))
Against Defendant Outlaw

106.    The allegations of Paragraphs 1 through 105 above are hereby realleged and incorporated by reference as if fully set forth therein.

**Defendant Outlaw realleges and reincorporates by reference all previous responses, answers, and defenses as if fully set forth herein.**

107.    Outlaw knowingly and intentionally accessed and obtained electronic information belonging to Plaintiffs without authorization.

**Denied.**

108.    Alternatively, Outlaw exceeded his authorized access to such information by using his access to the same to obtain information in Plaintiffs' computer system and servers that he was not entitled to obtain or alter.

**Denied.**

109.    Outlaw further knowingly accessed a protected computer of Plaintiffs' without authorization to fraudulently misappropriate Plaintiffs' Confidential Information which has significant commercial value by not being generally known, and which would be particularly valuable to one of Plaintiffs' competitors.

**Denied.**

110.    Outlaw's conduct in accessing Plaintiffs' computer network and servers implicated interstate commerce and communications.

**Denied.**

111.    Outlaw's access and obtaining of the electronic information, including Plaintiffs' Confidential Information, caused harm to Plaintiffs in excess of $5,000 during the one-year period from the date of Outlaw's first seizure of Plaintiffs' electronic information.

**Denied.**

112.    Plaintiffs seek injunctive relief and compensatory and punitive damages under 10 U.S.C. §1030(g) in an amount to be proven at trial.

**Defendant Outlaw denies Plaintiff's entitlement to any relief whatsoever. Except as expressly admitted herein, all other allegations in Paragraph 112 are hereby denied.**

113.    As a direct and proximate result of Outlaw's actions, Plaintiffs have suffered and continue to suffer irreparable harm for which there is no adequate remedy at law, and which will continue unless Outlaw is enjoined.

**Denied.**

### Sixth Cause of Action
**Violation of Defend Trade Secrets Act**
(18 U.S.C. §1836 *et seq.*)
Against All Defendants

114.    The allegations of Paragraphs 1 through 113 above are hereby realleged and incorporated by reference as if fully set forth therein.

**Defendant Outlaw realleges and reincorporates by reference all previous responses, answers, and defenses as if fully set forth herein.**

115.     Based on the foregoing conduct alleged in the complaint, Outlaw has also violated the federal Defend Trade Secrets Act ("**DTSA**").

**Defendant Outlaw reiterates previous denials regarding the conduct Plaintiffs allege. Defendant Outlaw further denies violating the federal Defend Trade Secrets Act.  Except as expressly admitted herein, all other allegations in Paragraph 115 are denied.**

116.     Outlaw received and had access to Plaintiffs' Confidential Information and trade secrets as  Plaintiffs' managerial employee, Shareholder and Member.

**Denied.**

117.     This information includes, but is not limited to, compilations of customer information including preferences, pricing, and decision makers; client job proposals and bids; sales leads and prospective customers; marketing strategies, future Company expansion plans; and project profit and loss statements.

**Denied.**

118.     All of this information constitutes trade secrets of Plaintiffs and has significant independent economic value to Plaintiffs from not being generally known to, and not being readily ascertainable through proper means by another person who can obtain economic value from the disclosure or use of this information.

**Denied.**

119.     A company or person with access to this information would save significant time and money by not having to develop their own set of such information.

**Defendant Outlaw lacks sufficient knowledge or information to form a belief as to the truth or falsity of the allegations contained in Paragraph 119, and thus denies the same.**

120.     These trade secrets are related to products and services used in, or intended for use in, interstate commerce, and they have commercial market value.

**Denied.**

121.     Outlaw knew or had reason to know that his knowledge of these trade secrets was acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secrets.

**Denied.**

122.     Plaintiffs have taken reasonable measures to protect this information and preserve its confidentiality as described above, including but not limited to, requiring Outlaw and other employees with access to Plaintiffs' trade secrets to execute nondisclosure and noncompete agreements, and not making this information publicly available.

**Defendant Outlaw lacks sufficient knowledge or information to form a belief as to the truth or falsity of the allegations contained in Paragraph 122, and thus denies the same.**

123. Outlaw has used Plaintiffs' trade secrets to unfairly and unlawfully compete against them, to solicit customers and employees and to provide himself and his new employer with an unfair competitive advantage.

**Denied.**

124. LFGSP knowingly received, used and benefitted from the misappropriated Confidential Information provided to it by Outlaw

**Defendant Outlaw denies providing LFGSP with any Confidential Information or trade secrets. Except as expressly admitted herein, all other allegations in Paragraph 124 are denied.**

125. Defendants' misappropriation has irreparably harmed Plaintiffs and continues to do so.

**Defendant Outlaw denies any misappropriation. Defendant Outlaw denies harming Plaintiffs. Except as expressly admitted herein, all other allegations in Paragraph 125 are denied.**

126. Plaintiffs are entitled to damages for both actual loss and the unjust enrichment caused by Defendants' actions that are not considered in computing actual loss.

**Denied.**

127.    Defendants' actions were made in bad faith and were willful and malicious, entitling Plaintiffs to exemplary damages under 18 U.S.C. § 1836(b)(3)(C).

**Denied.**


128.    Under 18 U.S.C. § 1836(b)(3)(D), Plaintiffs are entitled to recover their attorneys' fees;

**Denied.**


129.    Under 18 U.S.C. § 1836(b)(3)(A), injunctive relief is necessary to prevent actual or threatened misappropriation, which has or will cause injury for which there is no adequate remedy at law.

**Denied.**


**<u>Seventh Cause of Action</u>**
**Breach of Fiduciary Duty**
Against Defendant Outlaw

130.    The allegations of Paragraphs 1 through 129 above are hereby realleged and incorporated by reference as if fully set forth therein.

**Defendant Outlaw realleges and reincorporates by reference all previous responses, answers, and defenses as if fully set forth herein.**

131.     As a Member and Director of the O&M and Jet-Vac lines of business, Plaintiffs placed confidence in Outlaw to act in good faith with regard to Plaintiffs' interests.

**Defendant Outlaw lacks sufficient knowledge or information to form a belief as to the truth or falsity of the allegations contained in Paragraph 131, and thus denies the same.**

132.     Outlaw was in a position of domination and influence over Plaintiffs' O & M and Jet-Vac business and employees, and was entrusted with Confidential Information regarding Plaintiffs' business, strategies, and employees.  Indeed, Outlaw had extensive access to Plaintiffs' Confidential Information exceeding that of most Plaintiffs' employees.

**Denied.**

133.     Given the nature of Outlaw's position with Plaintiffs and access to their Confidential Information, Outlaw owed Plaintiffs certain fiduciary duties, including the duties of loyalty, good faith, fair dealing, to act in Plaintiffs' best interests and to avoid acting in a manner detrimental to Plaintiffs' financial, business, and other interests.

**Denied.**

134. Outlaw breached his fiduciary duties to Plaintiffs by, among other things, surreptitiously misappropriating Plaintiffs' Confidential Information while still employed on the eve of his departure from Plaintiffs, using that Confidential Information to undermine and interfere with Plaintiffs' business and customer relationships and to help his new employer unfairly compete against Plaintiffs, and soliciting and/or attempting to solicit Plaintiffs employees for employment at LFGSP. Outlaw engaged in all of these actions while still an owner of Plaintiffs.

**Defendant Outlaw denies he owed an fiduciary duty to Plaintiffs. Except as expressly admitted herein, all other allegations in Paragraph 134 are denied.**

135. By acting in the manner described herein, Outlaw did not exercise the care required in his position, in that he used his position of trust and confidence to further his own interests and the interests of his newly formed competing business, and in doing so caused injury to Plaintiffs.

**Defendant Outlaw denies he acted in the manner described herein and further denies that he was in a position of trust and confidence. Except as expressly admitted herein, all other allegations in Paragraph 135 are denied.**

136. As a direct and proximate result of Outlaw's actions, Plaintiffs have been damaged in an amount to be proven at trial.

**Denied.**

137.    As a result, Outlaw has breached, and continues to breach, his fiduciary duty and duty of loyalty owed to Plaintiffs, and Plaintiffs have been and continues to be irreparably harmed by Outlaw's actions.

**Denied.**


138.    Outlaw's 2020 Noncompete Agreement provides that Plaintiffs may seek injunctive relief from the Outlaw for the above-described actions.

**Defendant Outlaw lacks sufficient knowledge or information to form a belief as to the truth or falsity of the allegations contained in Paragraph 138 and thus denies the same.**


### Eighth Cause of Action
**Tortious Interference with Contract**
Against Defendant LFGSP

139.    The allegations of Paragraphs 1 through 138 above are hereby realleged and incorporated by reference as if fully set forth herein.

**Defendant Outlaw realleges and reincorporates by reference all previous responses, answers, and defenses as if fully set forth herein.**


140.    LFGSP had knowledge of Plaintiffs' contractual rights and Outlaw's contractual obligations set forth in his Outlaw's Agreements.

**Defendant Outlaw lacks sufficient knowledge or information to form a belief as to the truth or falsity of the allegations contained in Paragraph 140, and thus denies the same.**

141.    LFGSP induced, and continues to induce, Outlaw not to perform his contractual obligations to Plaintiffs under the Agreements.

**Denied.**

142.    In so doing, LFGSP acted, and continues to act, without justification, particularly because the core of plan was to induce Outlaw to unlawfully misappropriate, retain, and transfer Plaintiffs' Confidential Information for their direct use and benefit to unfairly compete against Plaintiffs.

**Denied.**

143.    As a direct and proximate result of the actions of LFGSP, as described above, Plaintiffs have been damaged in an amount to be proven at trial.

**Denied.**

**<u>Ninth Cause of Action</u>**
**Tortious Interference with Customer Relations and**
**Prospective Customer Relations and Economic Advantage**
Against All Defendants

144.    The allegations of Paragraphs 1 through 143 above are hereby realleged and incorporated by reference as if fully set forth herein.

**Defendant Outlaw realleges and reincorporates by reference all previous responses, answers, and defenses as if fully set forth herein.**

*Integrity et al v. Outlaw et al*
Defendant Outlaw's Affirmative Defenses and Answer to Amended Complaint

145.    Plaintiffs have maintained steady and lucrative relationships with its three Major Clients for many years.  Plaintiffs had every expectation that these relationships would continue well into the future, including specifically through Plaintiffs winning multi-year contracts with some or all of those Major Clients.

**Defendant Outlaw lacks sufficient knowledge or information to form a belief as to the truth or falsity of the allegations contained in Paragraph 145, and thus denies the same.**

146.    Plaintiffs understood that Outlaw had frequent and ongoing contact with many of those Major Clients, particularly in the Jet-Vac area of their business, and that his relationships with these customers could potentially jeopardize Plaintiffs' future business with those Major Clients if Outlaw were to ever leave Plaintiffs and go to work for a competitor like LFGSP and use Plaintiffs' Confidential Information pertaining to those clients to gain an unfair competitive advantage.  Plaintiffs protected themselves against such a development by requiring Outlaw to enter into the Agreements and to be bound by the restrictive covenants contained therein.

**Denied.**

147.    On or about the time that LFGSP and Outlaw began discussing Outlaw's prospective employment, Outlaw provided LFGSP with a copy of his Agreements and, upon information and belief, LFGSP reviewed those Agreements and fully understood the scope of the

restrictive covenants and the legal restrictions upon Outlaw should he become employed with LFGSP.

**Defendant Outlaw admits that he provided LFGSP with a copy of his Agreements. Except as expressly admitted herein, Defendant Outlaw lacks sufficient knowledge or information to form a belief as to the truth or falsity of the allegations in Paragraph 147 and therefore denies the same.**

148. Despite the foregoing, LFGSP concluded that hiring Outlaw and gaining access to Plaintiffs' Confidential Information regarding its Major Client relationships, including pricing, bids and preferences, and Plaintiffs' business methods and operational advantages that allowed them to retain these Major Clients for many years was more important and it elected to go forward with this plan with full knowledge that it could lead to adverse legal consequences for both Outlaw and LFGSP.

**Denied.**

149. Upon information and belief, LFGSP provided Outlaw with financial incentives to induce him to go through with this plan and continue to violate the restrictive covenants in his Agreements.

**Denied.**

*Integrity et al v. Outlaw et al*
Defendant Outlaw's Affirmative Defenses and Answer to Amended Complaint
Page **74** of **80**

Case 3:25-cv-00220-FDW-SCR    Document 19    Filed 11/19/25    Page 74 of 80

150.    Through Outlaw's unlawful disclosure of Plaintiffs' Confidential Information regarding its Major Clients, LFGSP began a targeted campaign to take business from Plaintiffs' Major Clients which had previously been exclusive to Plaintiffs by using Plaintiffs' Confidential Information that had been misappropriated by Outlaw in the weeks immediately preceding his resignation from Plaintiffs.    Upon information and belief, this included using information regarding Plaintiffs' historical pricing for its Major Clients and recent bids that had been prepared for one or more of those Major Clients for multi-year projects.

**Denied.**


151.    Defendants' actions as described above were without justification and were specifically intended to interfere with, damage and divert Plaintiffs' most important and financially lucrative client relationships to enable LFGSP to convert those Major Clients' business to their own benefit.

**Denied.**


152.    As a result of Defendants' wrongful and intentional actions, Plaintiffs have suffered and continue to suffer substantial damages in the form of monetary losses.    Upon information and belief, Defendants took these actions to cause Plaintiffs severe economic harm.

**Denied.**

153.    The allegations of paragraphs 1 through 152 are hereby realleged and incorporated by reference as if fully set forth herein.

**Defendant Outlaw realleges and reincorporates by reference all previous responses, answers, and defenses as if fully set forth herein.**

154.    Upon information and belief, the Defendants conspired as part of a common scheme and objective, and each agreed with one another to perform the unlawful acts alleged herein, undertake the actions alleged herein, and cause damages to Plaintiffs.

    **Denied.**

155.        Upon information and belief, the Defendants entered into an agreement pursuant to which Outlaw would misappropriate Plaintiffs' Confidential Information and transfer the same to LFGSP to enable them to unfairly compete against Plaintiffs and solicit and divert the business of their Major Clients.

    **Denied.**

156.    In furtherance of the conspiracy, Outlaw misappropriated Plaintiffs' Confidential Information and transferred it to LFGSP, who has used, and continues to use, Plaintiffs' Confidential Information in furtherance of their conspiracy.

    **Denied.**

157.    As a direct and proximate result of Defendants' conspiracy, Plaintiffs' have been subjected to severe economic harm and are entitled to damages in an amount to be proven at trial.

**Defendant Outlaw denies the existence of any conspiracy.   Except as expressly admitted herein, all other allegations in this Paragraph are denied.**

<u>**Eleventh Cause of Action**</u>
**Unfair and Deceptive Trade Practices**
**N.C. Gen. Stat. § 75-1.1 *et. seq.***
**Against All Defendants**

158.    The allegations of Paragraphs 1 through 157 are hereby realleged and incorporated by reference as if fully set forth herein.

**Defendant Outlaw realleges and reincorporates by reference all previous responses, answers, and defenses as if fully set forth herein.**

159.    Outlaw's actions described above which constitute misappropriation of trade secrets were in and affecting commerce as defined by N.C. Gen. Stat. § 75-1.1 *et seq.*

**Defendant Outlaw denies taking the alleged actions and denies that such alleged actions were in or affecting commerce.   Except as expressly admitted herein, all other allegations in Paragraph 159 are denied.**

160.    Outlaw's actions as set forth above constitute unfair methods of competition and unfair or deceptive trade practices in and affecting commerce in violation of N.C. Gen. Stat. § 75-1.1 *et seq.*

**Defendant Outlaw denies taking the alleged actions and denies that any action he took constituted an unfair method of competition or an unfair or deceptive trade practice. Except as expressly admitted herein, all other allegations in Paragraph 160 are denied.**

161.    As a direct and proximate result of Outlaw's unfair and/or deceptive methods, acts or practices, Plaintiffs have been damaged in an amount to be proven at trial and are entitled to the relief set forth below.

**Defendant Outlaw denies engaging in any unfair and/or deceptive methods, acts, or practices. Except as expressly admitted herein, all other allegations in Paragraph 161 are denied.**

162.    Plaintiffs are also entitled to an award of treble damages pursuant to N.C. Gen. Stat. § 75-16 for damages sustained as a result of Outlaw's unfair and deceptive conduct and attorneys' fees.

**Defendant Outlaw denies engaging in any unfair and/or deceptive conduct. Except as expressly admitted herein, all other allegations in Paragraph 162 are denied.**

**WHEREFORE, Defendant Outlaw prays for the following relief:**

1.     That the Court deny Plaintiffs' motions for Temporary, Preliminary, and Permanent Injunctive relief;

2.     That the Plaintiffs have and recover nothing of Defendant Outlaw;

3.     That the Court award Defendant Outlaw his attorney's fees as permitted by law;

4.      That this matter be tried before a jury; and

5.      For such further relief that this Court deems just and proper.

This 19th day of November, 2025.

**HULL & CHANDLER**

By:     /s/ Elizabeth Vennum
        Elizabeth Vennum
        NC State Bar No. 49747
        Counsel for Defendant
        Hull & Chandler
        1009 East Boulevard
        Charlotte, North Carolina 28203
        Telephone: (704) 375-8488
        Fax: (704) 375-8487
        E-mail: lvennum@lawyercarolina.com
        *Counsel for Defendant Matthew Outlaw*

## Certificate of Service

The undersigned certifies that on this day, the foregoing was filed with the Court's electronic filing system, which will serve a copy on counsel for Integrity as below set forth, and the undersigned served the foregoing on out-of-state counsel for Defendant LFGSP as below set forth.

| | |
|---|---|
| G. Bryan Adams, III<br>Van Hoy, Reutlinger, Adams, Pierce, & Tisdale, PLLC<br>737 East Boulevard<br>Charlotte, North Carolina 28203<br>bryan.adams@vraptlaw.com<br>*Counsel for Plaintiffs* | Shawn McGraw<br>smcgraw@kdglegal.com<br>Jim Drozdowski<br>jimd@kdglegal.com<br>*Counsel for Defendant LFG Service Partners, Inc.* |

This, the 19th day of November, 2025

### HULL & CHANDLER

By:     /s/ Elizabeth Vennum
Elizabeth Vennum
NC State Bar No. 49747
Counsel for Defendant
Hull & Chandler
1009 East Boulevard
Charlotte, North Carolina 28203
Telephone: (704) 375-8488
Fax: (704) 375-8487
E-mail: lvennum@lawyercarolina.com
*Counsel for Defendant Matthew Outlaw*